595 A.2d 1153

Sallee J. BURNS, Thomas R. Simkins
and Ronald T. Simkins, Appellees,

v.

Mae C. KABBOUL, Individually and as Executrix
of the Estate of Verne Lafferty, Decedent,
Appellant. (Two Cases)

Superior Court of Pennsylvania.

Argued Sept. 26, 1990.

Filed July 25, 1991.

292

Joey A. Storaska, Sunbury, for appellant.

David E. Lehman, Harrisburg, for appellees.

Before BECK, KELLY and POPOVICH, JJ.

KELLY, Judge:

This is an appeal from a final order which invalidated the September 9, 1985 will of the decedent, Verne Lafferty, which had left the bulk of his estate to the appellant, Mae C. Kabboul. Kabboul has raised five issues for our review: 1) whether the trial court erred in not affording greater evidentiary weight to a prior will which named Kabboul as the residuary beneficiary; 2) whether the trial court's invalidation of the 1985 will was grounded upon sufficient evidence; 3) whether the trial court employed the proper procedures concerning presumptions in a will contest; 4) whether the trial court erred in refusing to direct the admission to probate as a lost will the copy of a prior will,

which was missing a page, upon its invalidation of the 1985 will; and 5) whether the trial court committed error when it failed to hold an evidentiary hearing before imposing a constructive trust upon all of Kabboul's real and personal property. We affirm in part and remand with instructions to the trial court to order the admission to probate of the valid portions of the 1982 will.

The relevant facts and procedural history of this case are as follows. The decedent, Verne Lafferty, was born on July 11, 1895, in Lynchburg, Ohio. Lafferty left Lynchburg after serving in the United States Army in World War I and settled in Shamokin, Pennsylvania, where he lived until shortly before his death. Lafferty never married; however, he had a number of girlfriends over the years, some of whom he remained in contact with after their romantic involvement had ceased. Lafferty owned and operated the Shamokin Equipment Company which sold bar and restaurant supplies until 1974, when he sold the business to a long-time employee and retired.

Throughout his life, Lafferty maintained a keen interest in the stock market. Lafferty was a skilled and successful investor who had amassed a substantial investment portfolio of stocks and bonds over the years. Lafferty's interest and participation in the financial markets continued into his retirement and by 1984, he estimated his net worth to be in the neighborhood of 3.5 million dollars. Lafferty maintained ledger books in his apartment which contained detailed recordings of his various market transactions. These books were kept in a safe in Lafferty's apartment together with his stock certificates and bearer bonds. The ledger books disappeared during Lafferty's final illness and have not been found.

Shortly before his retirement in 1974, Lafferty became acquainted with Mae Kabboul who had purchased restaurant supplies from the Shamokin Equipment Company for a dining room she operated briefly with a partner in Shamokin's James Madison Hotel. The two became friendly and Kabboul became Lafferty's companion, housekeeper, chauf-

feur and secretary. Lafferty paid Kabboul for her services. Eventually Kabboul moved into Lafferty's apartment and continued to reside with him until she purchased a $225,000 home in Alexandria, Virginia in 1984. Kabboul maintained that she was able to afford this home through shrewd stock investments and the sale of land she had owned in Lebanon. At trial, Kabboul's sister testified that Kabboul did not sell any of the land owned by her family in Lebanon between the years of 1980 and 1984. After purchasing the home, Kabboul began to spend weekends in Virginia while residing at Lafferty's apartment in Shamokin during the week.

In January, 1981, Lafferty closed a bank account which he had maintained at the Pennsylvania National Bank since 1924. Lafferty then opened an account at the Northern Central Bank. In early 1982, Attorney H. Robert Mattis was retained by Lafferty to prepare a general power of attorney for him in favor of Kabboul. This power of attorney was signed by Lafferty on January 9, 1982. After the execution of the power of attorney, Kabboul began carrying Lafferty's dividends and other checks to the bank for deposit. Lafferty told an old girlfriend, Victoria Trate, that the power of attorney was given to Kabboul for the sole purpose of doing Lafferty's banking and for no other reason.

In the spring of 1983, a joint account was opened in the names of Verne Lafferty and Mae Kabboul at the Pennsylvania National Bank. According to Kabboul's testimony at trial, the joint bank account was to be used in the event Lafferty became seriously ill.

In addition to his many friends in Shamokin, Lafferty also had a sister, Freda Lafferty Simkins, who predeceased him in 1976. Mrs. Simkins was survived by a daughter-in-law, Jean Simkins, and three grandchildren, Sallee Simkins Burns, Thomas R. Simkins and Ronald T. Simkins, Verne Lafferty's grandniece and grandnephews, who are the appellees in this case. Lafferty maintained contact with his family who remained in Ohio and other portions of the

Midwest throughout his life and had been especially close to his deceased sister.

After his sister's death, Lafferty became estranged from his family as a result of a misunderstanding surrounding the circumstances of his sister's death. Lafferty was informed at his sister's funeral by a distant relative that his sister had died alone. Lafferty became very angry with his remaining relatives for allowing this to occur. However, sometime later when the actual circumstances of his sister's death became known to him, there was a resumption of friendly relations between Lafferty and his blood relatives, which included several visits by family members to Lafferty's home in Shamokin.

Following the death of his sister in 1976, Lafferty prepared a new holographic will which was executed but not witnessed. This will named Kabboul as executrix but also noted that Lafferty's long-time attorney, Vincent Makowski, was to assist her and serve as counsel to the estate. This presented a change from Lafferty's previous will in which Makowski had been named sole executor.

In January 1982, shortly after Attorney H. Robert Mattis prepared a power of attorney for Lafferty, Lafferty directed Kabboul to take portions of the 1976 holographic will together with some handwritten notes to Mattis' office in order to prepare a new will. Mattis drew up the will in accordance with Lafferty's instructions; however, Lafferty ordered Mattis not to retain a copy of the will in his office files. The will was executed by Lafferty and witnessed by two witnesses.

The 1982 will contained thirty-four clauses in which Lafferty left money to various charities and friends. Lafferty also left $25,000 in cash and the proceeds from the sale of specifically designated securities to the sixty poorest families in the City of Shamokin and surrounding Coal Township. Attorney Mattis told Lafferty that this clause would be difficult to administer; however, Lafferty stated this is what he wanted to do and the clause remained in the will. The will named Kabboul as the residuary beneficiary. The

unexecuted copy of this will, which was placed into evidence by Kabboul, made no mention of Lafferty's blood relatives, the appellees; however, this unexecuted copy was also missing a page which should have contained clauses twenty-two through twenty-eight of the will. Shortly after the execution of the will, Lafferty told Ronald McElwee, a witness called by Kabboul, that he was leaving the bulk of his estate to his family. (McElwee's Testimony at 8).

In the years following the execution of the 1982 will, Lafferty's family and many of his long-time friends began to notice a deterioration of his physical and mental capabilities. There was testimony that Lafferty, who had previously been impeccable in his dressing and grooming habits, began wearing mismatched clothing and appearing in public looking disheveled. There was also testimony from witnesses that when they attempted to engage Lafferty in conversation, his answers were non-responsive and repetitive. There was also documentary evidence that Lafferty repeatedly made mistakes when writing checks. Finally, there was testimony from Ronald McElwee and Virginia Trate that Lafferty expressed concern that Kabboul was going to try to take all of his money. (McElwee's Testimony at 10); (Trate's testimony at 125).

In August of 1984, Lafferty allegedly decided that he wanted to make some changes in his will. Kabboul testified that she urged Lafferty to seek the services of an attorney, but Lafferty insisted upon preparing the will himself. This will was prepared with Kabboul as the scrivener. The will allegedly named Kabboul as executrix and residuary beneficiary. However, it was never presented into evidence at trial.

In the summer of 1985, Lafferty went alone to the barber shop of his long-time friend, Leon Misco, for a haircut. During the haircut Lafferty told Misco he did not have a will. Misco, who held a notary's commission, offered to assist Lafferty if he wished to make a will. Lafferty, who had been getting his haircut at Misco's barber shop for years, never appeared in the shop again. Kabboul then

began driving Lafferty eighteen miles to a barber in Sunbury for his haircuts.

In September of 1985, Lafferty again purportedly decided to prepare a new will. This will, according to Kabboul's testimony, was prepared over the course of several days and typed by Kabboul at Lafferty's instruction. After the will was typed, Lafferty directed Kabboul to take the will to attorney Mattis' office for his review. Upon arriving at Mattis' office, Kabboul testified that she was told by Barbara Oshinski, who was Kabboul's partner in several investments, that Mattis was unavailable. Barbara Oshinski reviewed the will and told Kabboul that she would pick up the will after its execution.

When Kabboul returned to the apartment with the unsigned will, Lafferty allegedly instructed her to go to the apartment below and ask the tenants, Harold and Brenda Burnell, to witness the execution of the will. However, Brenda Burnell was not home at that time and only Harold Burnell was able to serve as a witness. After Lafferty executed the will, Barbara Oshinski arrived at Lafferty's apartment. Oshinski testified that she discussed the provisions of the will with Lafferty alone in the bedroom. After this discussion, Oshinski noticed that Lafferty's signature was already affixed to the will. Oshinski then signed the will as the second attesting witness.

The will executed by Lafferty on September 9, 1985 made relatively modest bequests to family members, friends and charities while naming Kabboul as executrix and leaving her the bulk of the estate as residuary beneficiary. The will also deleted a provision contained in the 1982 will which provided for the sixty poorest families in Shamokin and Coal Township.

Lafferty became seriously ill in February of 1986 and, at the instruction of a physician, was taken to Shamokin General Hospital. After his release from the hospital, he returned briefly to his apartment under the care of Kabboul. At this time Kabboul called Lafferty's family and told them that he had been ill but was feeling better. Very

shortly thereafter, Lafferty was taken by Kabboul to Wilkes Barre Veterans' Hospital where he remained for three weeks. Upon his release, Lafferty returned very briefly to Shamokin and was then taken by Kabboul to the Veterans Medical Center of Washington, D.C.

During the time period between the onset of Lafferty's illness and his transfer to Washington, D.C., Kabboul used the power of attorney executed in 1982 to transfer large amounts of stocks and bonds, which had been kept in Lafferty's safe to which Kabboul had the combination, out of Lafferty's name and into her own name. Kabboul testified at trial that she made the transfers at Lafferty's instruction. Also during this time period, Lafferty's clothing, furnishings and personal effects were either disposed of by Kabboul or taken to her home in Virginia. At the time of his death, the only asset remaining in Lafferty's name was the title to the apartment building in which he had resided in Shamokin. Every other asset previously owned by Lafferty was gone.

In late July of 1986, Lafferty's niece by marriage, Jean Simkin, received a phone call from Lafferty's old friend, Victoria Trate, from Washington, D.C. Trate informed Simkin that Lafferty was in serious trouble. Trate told Simkin that Kabboul was taking all of Lafferty's money and that they should hire a lawyer immediately to stop her. Lafferty's grandniece, Sallee Burns, appellee, called Kabboul and was informed by her that Lafferty was doing fine and told her not to call Lafferty at the hospital because his bed was inaccessible to a phone. Jean Simkin and Sallee Burns then went to Washington, D.C. without telling Kabboul. When they arrived at the Veterans Medical Center of Washington, D.C., they were informed that Lafferty was no longer a patient there. They then began telephoning nursing homes in the Washington, D.C. area and subsequently found that Lafferty had been admitted to the Woodbind Nursing Home in Alexandria, Virginia. Upon their arrival at the home, they discovered that Lafferty's admission papers, which had been filled out by Kabboul, stated that

Lafferty had no living relatives. Simkin and Burns then visited Lafferty and found him to be in a confused state. They also discovered that Lafferty was without his glasses and his dentures and was wearing borrowed clothes. The family then instituted guardianship proceedings in Northumberland County and a rule to show cause why a guardian should not be appointed was issued. However, before the return date of the rule, Verne Lafferty died on August 28, 1986.

On August 29, 1986, Kabboul offered for probate the September 9, 1985 will. The document was admitted to probate and letters testamentary were issued by the Register of Wills of Northumberland County to Kabboul. The appellees filed a petition for issuance of citation and appeal from probate. The appellees also filed a complaint in equity requesting a preliminary injunction directing Kabboul to retain, preserve and account for all assets obtained by her in her capacity as executrix while the appeal from the admission to probate of the September 9, 1985 will was pending in Orphans' Court. The appellees also requested a permanent injunction directing Kabboul to return, repay and refund to the estate of Verne Lafferty all assets received and obtained from Lafferty during his lifetime. The petition for issuance of citation and appeal from probate and the appellees' complaint in equity seeking injunctive relief were consolidated by the trial court. After extensive discovery by both parties, the case was listed for trial.

At trial, both parties presented extensive testimony from witnesses who were personally acquainted with Lafferty. These witnesses testified as to both Lafferty's mental capabilities during the last years of his life and his relationship with Kabboul. Both parties also presented expert medical testimony as to the issue of whether Lafferty was afflicted with Alzheimer's disease during the last years of his life. After the completion of all testimony, the trial court issued an order and decree nisi finding the September 9, 1985 will invalid as it was obtained through the exercise of undue

influence. The trial court also rescinded all transfers of property, assets and other forms of wealth of Lafferty which occurred prior to his death. The trial court further commanded Kabboul to file an accounting with the trial court of all of her assets both real and personal and ordered Kabboul not to transfer any of the assets governed by the order. Kabboul's post-verdict motions were denied. Kabboul was then removed as executrix of Lafferty's estate and an administrator of the estate was appointed by the trial court. This timely appeal followed.

On appeal, Kabboul raises five issues for our review:

A. DID THE HEARING JUDGE MISAPPLY THE LAW BY FAILING TO GIVE ANY LEGAL CONSIDERATION TO THE FINDING OF A VALID PRIOR WILL WITH THE SAME DISPOSITIVE PLAN, DEMONSTRATING THE ABSENCE OF UNDUE INFLUENCE, AND IN ATTEMPTING TO DETERMINE WHETHER THE CONTESTED WILL WAS CONSISTENT WITH THE TESTATOR'S CHARACTER?

B. DID THE HEARING JUDGE ABUSE HIS DISCRETION IN INVALIDATING THE 1985 WILL WHERE THAT CONCLUSION WAS NOT GROUNDED UPON LEGALLY COMPETENT AND SUFFICIENTLY CONVINCING EVIDENCE?

C. DID THE HEARING JUDGE ABUSE DISCRETION IN THE PROCEDURE EMPLOYED CONCERNING PRESUMPTIONS, AND ON EVIDENTIARY RULINGS WHICH SUBSTANTIALLY EFFECTED THE OUTCOME OF THE CASE?

D. DID THE HEARING JUDGE ERR IN REFUSING TO DIRECT THE ADMISSION TO PROBATE OF A 1982 WILL OF VERNE LAFFERTY ADMITTED INTO EVIDENCE AT THE TRIAL OF THIS CAUSE, OR IN REFUSING TO CONDUCT A HEARING ON THE SUBJECT AFTER ENTRY OF THE DECREE NISI?

E. DID THE TRIAL COURT ERR IN FAILING TO MODIFY THE DECREE NISI BY REFUSING TO HOLD AN EVIDENTIARY HEARING TO DETERMINE THE VALUE OF ASSETS TRANSFERRED, IN REFUSING TO DISTINGUISH BETWEEN ASSETS TRANSFERRED TO MAE KABBOUL PRIOR TO 1984, IN FAILING TO PERMIT MAE KABBOUL TO DEMONSTRATE THE NATURE OF ASSETS EARNED THROUGH HER INDUSTRY, AND IN FAILING TO PROVIDE APPROPRIATE SECURITY IN THE EVENT THE DECREE IS REVERSED?

(Kabboul's brief at 4).

We note that our scope of review is limited. As we stated in *In re Estate of Bankovich*, 344 Pa.Super. 520, 522–23, 496 A.2d 1227, 1229 (1985), and reiterated in *In re Estate of Jakiella*, 353 Pa.Super. 581, 584, 510 A.2d 815, 816 (1986):

> Our review in [a will contest] is limited to determining whether the findings of fact ... rest on legally competent and sufficient evidence, and whether an error of law has been made or an abuse of discretion committed. It is not our task to try the case anew. The rule is particularly applicable 'to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony.' (Citations omitted).

Kabboul's first contention on appeal is that the trial court erred by failing to give adequate consideration to a prior will executed by Lafferty in 1982 which named Kabboul residuary beneficiary. Kabboul argues that under Pennsylvania law, prior wills containing the same testamentary dispositive scheme are strong evidence against undue influence. Kabboul asserts that because the 1982 will, which was prepared by an attorney, contained the same dispositive scheme, the trial court erred in its determination that the September 9, 1985 will executed by Lafferty was the prod-

uct of undue influence. We find this contention to be without merit.

■ It is well settled in Pennsylvania that a prior will containing the same testamentary disposition is strong evidence against undue influence. *Lawrence's Estate*, 286 Pa. 58, 132 A. 786 (1926); *Nichols Estate*, 275 Pa. 176, 118 A. 812 (1922); *Frazier Estate*, 75 Pa.D. & C. 577 (1951). A previous will executed by the testator who was admittedly of sound mind is admissible upon the theory that such a will tends to show the fixed and settled purpose of the testator, and any sudden change in such purpose without adequate cause may be evidence from which an unsound mind may be inferred. *Titlow v. Titlow*, 54 Pa. 216, 93 AM. Dec. 691 (1867); *Gorsuch Estate*, 8 Pa.D. & C.2d 325, 7 Fiduc Rep.2d 296 (1957); 3 Bowe–Parker: *Page on Wills* § 29:64. *See generally In re Lewis' Estate*, 364 Pa. 225, 72 A.2d 80 (1950).

■ In the instant case, Kabboul has attempted to use an incomplete unsigned copy of the 1982 will as a means of rebutting the presumption established by the evidence presented by the appellees that the September 9, 1985 will naming Kabboul as the residuary beneficiary was secured through the exercise of undue influence. While both the unexecuted copy of the 1982 and the September 9, 1985 will named Kabboul as the residuary beneficiary, the copy of the 1982 will is missing a page. The original 1982 will comprised six pages containing thirty-four clauses; however, the unexecuted copy of the 1982 will submitted into evidence by Kabboul was missing page four, which should have contained clauses twenty-two through twenty-eight. Accordingly, due to the absence of these clauses, it would be impossible for the trial court to make the determination that the testamentary scheme contained in the copy of the 1982 will was exactly the same as the testamentary scheme contained in the 1985 will in order to rebut the presumption of undue influence on the part of Kabboul.

Kabboul's second contention is that the trial court did not have sufficient evidence to invalidate the 1985 will as having been the product of undue influence. Kabboul argues that the appellees had failed to prove by clear and convincing evidence that a confidential relationship existed between Lafferty and Kabboul and that Lafferty was of weakened intellect at the time he executed the September 9, 1985 will. Kabboul asserts that because the appellees failed to prove by clear and convincing evidence two parts of the undue influence trilogy the trial court erred when it invalidated the September 9, 1985 will. We disagree.

■ The presumption of the validity of a will arises once a will is probated and the contestant has the burden of proving undue influence. *In re Estate of Jakiella, supra.* To meet this burden, the contestant is required to established by clear and convincing evidence that: (1) the testator was of weakened intellect at the time the will was executed; (2) the proponent of the will stood in a confidential relationship with the testator; and (3) the proponent received substantial benefit under the will. *Estate of Reichel,* 484 Pa. 610, 615, 400 A.2d 1268, 1273 (1979); *In re Estate of Ziel,* 467 Pa. 531, 541, 359 A.2d 728, 734 (1976). *In re Estate of Angier,* 381 Pa.Super 114, 119, 552 A.2d 1121, 1123 (1989). Once this burden is met by the contestant, the burden is then shifted to the proponent to show the absence of undue influence. *In re Estate of Jakiella, supra.*

Instantly, Kabboul readily admits that she has been left the bulk of Lafferty's estate under the September 9, 1985 will. Thus, we need only review whether the evidence, when viewed in the light most favorable to the appellees, was sufficient to support the trial court's finding that Lafferty was of weakened intellect when the will was executed and that a confidential relationship existed between Kabboul and Lafferty which permitted Kabboul, through the exercise of undue influence, to become the recipient of the bulk of Lafferty's estate.

■ First, we will examine the weakened intellect requirement. The "weakened intellect" which must be shown in order to establish a *prima facie* case of undue influence upon the testator need not amount to testamentary incapacity. *In re Clark's Estate*, 461 Pa. 52, 334 A.2d 628 (1975). Although testamentary capacity is to be determined by the condition of the testator at the very time he executes a will, evidence of incapacity for a reasonable time before and after the making of a will is admissible as an indication of lack of capacity on the day the will is executed. *In re Hastings' Estate*, 479 Pa. 122, 387 A.2d 865 (1978); *In re Clark's Estate, supra.* While a testator may dispose of his property as he sees fit, the law is rigid in its insistence that one of weak mind, whether from inherent cause or by reason of illness, shall not be imposed upon by the art and craft of designing persons. *In re Patti's Estate*, 133 Pa.Super. 81, 1 A.2d 791 (1938).

Instantly, both the appellees and Kabboul presented extensive testimony from witnesses who were personally acquainted with Lafferty as to whether or not he was suffering from a weakened intellect during the last years of his life. Both parties also presented expert medical testimony for and against the proposition that Lafferty was afflicted with Alzheimer's disease during the last years of his life. The trial court heard all of the conflicting testimony and made the determination that Lafferty was indeed suffering from a weakened intellect at the time he executed the September 9, 1985 will. As appellees presented ample evidence to support this conclusion by the trial court, we find no abuse of discretion.

■ Next, we must determine whether the evidence supports the trial court's conclusion that a confidential relationship existed between Lafferty and Kabboul at the time the September 9, 1985 will was executed.

"For purposes of voiding a will on the ground of undue influence, a confidential relationship exists whenever circumstances make it certain that the parties did not deal on equal terms but that on the one side there was an

overmastering influence, and on the other, dependence or trust, justifiably reposed." *In re Estate of Ross, supra,* 316 Pa.Super. [36] at 42, 462 A.2d [780] at 783 [1983]. *In re Estate of Bankovich,* 344 Pa.Super 520, 523, 496 A.2d 1227, 1229 (1985).

There is no precise formula for finding a confidential relationship, but generally it will be found when one justifiably reposes his trust in the hands of another who possesses some overmastering influence. This trust is given with confidence that it will be used in the testator's best interests.

*Estate of Cooper,* 351 Pa.Super. 482, 486, 506 A.2d 451, 453 (1986). The fact that the testator gave the proponent power of attorney over his entire life savings is a clear indication that a confidential relationship existed between the parties. *In re Clark's Estate, supra; Foster v. Schmitt,* 429 Pa. 102, 108, 239 A.2d 471, 474 (1968). It will weigh heavily against the proponent on the issue of undue influence when the proponent was either the scrivener of the will or present at the dictation of the will. *In re Clark's Estate, supra; Klingner v. Dugacki,* 356 Pa. 143, 51 A.2d 627 (1947); *In re Stewart's Estate,* 354 Pa 288, 47 A.2d 204 (1946). Once the burden of disproving undue influence shifts to the proponent, it is incumbent upon the proponent to demonstrate the absence of undue influence by clear and convincing evidence. *In re Estate of Button,* 459 Pa. 234, 328 A.2d 480 (1974); *In re Abrams' Estate,* 419 Pa. 92, 213 A.2d 638 (1965).

Instantly, a review of the record reveals the following. Kabboul served not only as Lafferty's primary caretaker, upon whom he was completely dependent, but she was also entrusted by him with a power of attorney in order to carry out various banking transactions on his behalf. Moreover, Kabboul was the scrivener of the September 9, 1985 will which left her the bulk of Lafferty's estate. Accordingly, the evidence presented by the appellees was more than sufficient to establish the existence of a confidential relationship between Lafferty and Kabboul.

The appellees' evidence successfully established all three prongs of the undue influence trilogy, thus placing the burden upon Kabboul to rebut the presumption by clear and convincing evidence. In her case, Kabboul presented testimony on her own behalf. The trial court found her testimony to be incredible. Kabboul also presented testimony from witnesses acquainted with Lafferty and medical experts who attempted to refute the appellees' argument that Lafferty had Alzheimer's disease. The trial court found the appellees' evidence concerning Lafferty's mental condition to be more credible, thus finding that Kabboul failed to rebut the presumption of undue influence by clear and convincing evidence. Accordingly, when viewed in the light most favorable to the appellees, the evidence presented was clearly sufficient to support the trial court's conclusion that the September 9, 1985 will was the product of undue influence; thus, we find no abuse of discretion in the trial court's finding that the will was void.

Kabboul's third contention is that the trial court utilized improper procedures concerning presumptions and admissions in will contest proceedings which substantially affected the outcome of the case. The first part of Kabboul's third contention is that the trial court erred procedurally when it deferred decision on her motion for a nonsuit at the completion of the appellees' case and then failed to subsequently inform her that the appellees had successfully carried their burden of raising the presumption of undue influence, thereby placing the burden upon Kabboul to rebut the presumption. Kabboul argues that due to the trial court's failure to inform her that the appellees had successfully carried their burden of raising the presumption of undue influence, she would have called several witnesses who did not testify at trial to rebut the presumption.

In a will contest proceeding on appeal from the register of will's order probating the will, it is sufficient for the proponents to offer the register of will's record of probate to establish a *prima facie* case of the will's validity. *In re Ash's Estate*, 351 Pa. 317, 41 A.2d 620 (1945); *In re*

*Szmahl's Estate,* 335 Pa. 89, 6 A.2d 267 (1939). When the proponent establishes a *prima facie* case by proof of the record of probate, the burden is upon the contestant to come forward with evidence to destroy the will. *In re Ash's Estate, supra,* 351 Pa. at 321, 41 A.2d at 622. If the contestant produces evidence which, if not contradicted by the proponent, would support a verdict against the will, the proponent's *prima facie* case has been overcome and the burden of going forward shifts back to the proponent. *In re Geho's Estate,* 340 Pa. 412, 17 A.2d 342 (1941); *In re Szmahl's Estate, supra; In re Plotts' Estate,* 335 Pa. 81, 5 A.2d 901 (1939).

■ Our review of the overall procedure utilized by the trial court in this case reveals no procedural error in regard to the shifting burdens of proof and presumptions. After the parties stipulated to the probate of the will, the burden was properly placed upon the appellees to defeat the presumption of the will's validity. The appellees met their burden by presenting evidence that, if unrefuted by Kabboul, would have supported a verdict against the will's validity on the basis that it was the product of undue influence. Thus, the burden was properly shifted to Kabboul to refute the presumption that the will was the product of undue influence. Kabboul attempted to rebut the presumption of undue influence by presenting testimony from both fact witnesses and medical experts that Lafferty was not of weakened intellect at the time of the execution of the will. The trial court heard all of the evidence offered by Kabboul and concluded Kabboul failed to rebut the presumption of undue influence. Thus, the trial court found the will to be the product of undue influence.

While the overall procedure utilized by the trial court was correct, Kabboul contends that the trial court's failure to rule on her motion for a nonsuit at the close of the appellees' case and ordering her to proceed with her case, prejudiced her by failing to let her know that the appellees had met their burden. Kabboul argues that had the trial court informed her that the appellees had established the pre-

sumption of undue influence, she would have called additional witnesses to rebut the presumption.

In will contests, a nonsuit may be granted at the close of the contestant's case only when it is clear that the contestant has presented insufficient evidence to maintain the action. *Estate of Dunlap,* 471 Pa. 303, 370 A.2d 314 (1977); 20 Pa.C.S.A. § 779. When ruling on a motion for nonsuit, the trial court views the evidence in the light most favorable to the contestant and gives the contestant the benefit of all favorable evidence and all reasonable inferences therefrom. *Estate of Dunlap, supra.* A motion for a compulsory nonsuit allows the defendant to test the sufficiency of the plaintiff's evidence and, as a general rule, may not be granted where the defendant has offered any evidence. *Atlantic Richfield v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978); *Target Sportswear Inc. v. Clearfield Foundation,* 327 Pa.Super. 1, 474 A.2d 1142 (1984). If the defendant elects to proceed and presents evidence, the nonsuit stage is over and the correctness of the court's ruling is moot. *F.W. Wise Gas Co., Inc. v. Beech Creek R.R. Co.,* 437 Pa. 389, 392, 263 A.2d 313, 315 (1970); *Burns v. City of Philadelphia* 350 Pa.Super. 615, 504 A.2d 1321 (1986).

Our review of the record does not reveal that Kabboul made a motion for nonsuit at the close of the appellees' case. Nor do we find any record of an objection to the trial court's decision to defer ruling on Kabboul's motion for a nonsuit until the completion of her case. The first mention on the record of the alleged motion for a nonsuit comes at the completion of the testimony of Kabboul's last witness to present live testimony where Kabboul's counsel requested the renewal of her motion for a compulsory nonsuit to which the trial court replied that it was deferring its ruling on the motion. (N.T. Volume 2 at 758).

In order to preserve this issue of the trial court's alleged failure to rule on the motion for nonsuit until after Kabboul

presented her case, Kabboul must have put on her case with the express condition that her nonsuit motion was not being waived. *See Target Sportswear v. Clearfield Foundation, supra.* As we have no record of specific objection to the trial court's deferral on Kabboul's alleged motion for nonsuit until after the presentation of Kabboul's case, we find that the issue was not properly raised and thus is waived.[1] *See Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974); *Larkin v. Metz,* 398 Pa.Super. 235, 580 A.2d 1150 (1990); Pa.R.A.P. 302(a).

Moreover, it is clear from the record that at the completion of their case, the appellees had, when viewed in the light most favorable to them, produced more than a sufficient amount of evidence to establish all three prongs of the undue influence trilogy. Thus, the appellees had met their burden of rebutting the presumption of the will's validity, and the burden had shifted to Kabboul to rebut the presumption of undue influence by clear and convincing evidence. Accordingly, it would have been error for the trial court to have entered a nonsuit against the appellees at the completion of their case.

Finally, Kabboul claims in her third issue that had she been informed that the appellees had successfully raised the presumption of undue influence, she would have called several people, who were listed on her pretrial witness list but did not testify at trial, to rebut the presumption. We find this claim to be without merit.

When the trial court deferred on Kabboul's alleged motion for a nonsuit at the close of the appellees' case, Kabboul was given a full opportunity to present evidence in favor of the will's validity. When Kabboul attempted to renew this motion after she presented her last witness to

---

**1.** We note it is the duty of the appellant to supply this Court with a record which is sufficient to permit a meaningful appellate review. A failure by the appellant to insure that the original record certified for appeal contains sufficient information to conduct a meaningful appellate review constitutes a waiver of the issue sought to be reviewed. *School District of Aliquippa, et al. v. Maryland Casualty Company, et al.,* 402 Pa.Super. 569, 587 A.2d 765 (1991).

testify in person before the court, the trial court stated that it was deferring a ruling on the motion. (N.T. Volume 2 at 758). After the appellees presented a short rebuttal, Kabboul was presented with the opportunity by the trial court to present a surrebuttal, which she declined. At that time, however, Kabboul requested that the record be left open to permit her to take the depositions of two witnesses who were unable to appear at trial. The trial court granted this request. One of the witnesses Kabboul wished to depose lived in Atlanta, Georgia. In order to obtain this witness' testimony, counsel for both parties had to fly down to Atlanta. These depositions were then entered into the record and the record was closed. The record in this case reveals that the trial court afforded Kabboul more than ample opportunity to present all of her evidence to rebut the appellees' case. The fact that she chose not to call certain witnesses who had appeared on her pre-trial witness list was solely her own decision and any blame for her failure to present these witnesses cannot be shifted to the procedure employed by the trial court, but rather must rest on her shoulders.

Kabboul also claims in her third issue that the trial court erred in failing to adopt numbers 110 through 114 of her proposed findings of fact. Kabboul argues that due to the appellees' failure to respond to her request for admissions, they are deemed to have admitted that Lafferty did not suffer from a weakened intellect on the day he executed the contested will. Kabboul argues that neither the appellees nor any of their witnesses could testify that on the basis of a personal observation of Lafferty that he suffered from a weakened intellect on the day he executed the contested will. Kabboul asserts trial court erred, therefore, in finding that Lafferty suffered from a weakened intellect on the day of the contested will's execution. We disagree.

In a will contest, the court is concerned with the testator's mental capabilities at the time he executed the will and testimony of his condition close to that time must be considered more significant. *In re Estate of Brantling-*

*er,* 418 Pa. 236, 248, 210 A.2d 246, 253 (1965); *In re Estate of Agostini,* 311 Pa.Super. 233, 244, 457 A.2d 861, 867 (1983). Evidence of the testator's state of mind shortly before or after the execution of the will may be received as reflective of the decedent's testamentary capacity at the time of the will's execution. *In re Estate of Agostini, supra,* 311 Pa.Superior Ct. at 244, 457 A.2d at 867. This evidence may be supplied by lay witnesses as well as experts. *In re Estate of Kuzma,* 487 Pa. 91, 94, 408 A.2d 1369, 1371 (1979); *In re Estate of Agostini, supra.* Medical expert testimony as to the decedent's weakened state of mind at the time of the will's execution based solely upon review of the decedent's medical records are entitled to little weight when opposed by the testimony of medical experts whose opinions of the decedent's mental state at the time of the will's execution are based upon personal examinations of the decedent. *In re Estate of Brantlinger, supra; Masciantonio Will,* 392 Pa. 362, 384, 141 A.2d 362, 373 (1958); *Estate of Younger,* 352 Pa.Super. 414, 508 A.2d 327 (1986); *In re Estate of Agostini, supra,* 311 Pa.Superior Ct. at 244, 457 A.2d at 867.

Instantly, both the appellees and Kabboul presented testimony from lay witnesses as to whether Lafferty was of weakened intellect either shortly before or at the time the will was executed on September 9, 1985. Both parties also presented conflicting expert medical testimony as to whether Lafferty was of weakened intellect at the time of the will's execution; however, neither parties' experts based their opinions upon a personal examination of Lafferty. Although Kabboul presented testimony from Dr. Broscius, a general practitioner who had examined Lafferty for the first time in mid-February, 1986, Dr. Broscius did not testify as to his opinion of Lafferty's testamentary capacity at the time of the will's execution. Thus here, unlike the *Agostini* and *Younger* cases, neither party produced testimony from a medical expert who concluded on the basis of a personal examination of Lafferty that he was not of a weakened intellect on the date of the contested will's execution. Accordingly, as the appellees produced both lay wit-

nesses who testified that Lafferty was of a weakened intellect shortly before the will's execution, and medical experts, who testified on the basis of their review of Lafferty's medical records that he was of a weakened intellect on the date of the will's execution, and who the trial court found to be more credible than Kabboul's witnesses, the trial court had a sufficient basis to find that Lafferty was of a weakened intellect on the date of the will's execution.

Kabboul's fourth contention is that the trial court erred in failing to direct the admission to probate an unexecuted copy of Lafferty's 1982 will with a page missing upon the trial court's finding that the 1985 will was void. The copy of the 1982 will had previously been introduced into evidence by Kabboul to show a similar prior testamentary disposition. Kabboul argues that as the trial court found the 1985 will to be the product of undue influence, the 1985 will's revocation of the 1982 will is ineffective. Therefore, the 1982 will remains in effect and the trial court should have directed the admission of the copy of 1982 will to probate as a lost will.

It is well settled that Pennsylvania law favors testamentary disposition of a decedent's assets. *In re Grier's Estate,* 403 Pa. 517, 524, 170 A.2d 545, 548 (1961); *Provident Trust Co. of Philadelphia v. Scott,* 335 Pa. 231, 6 A.2d 814 (1939); *Duffy's Estate,* 313 Pa. 101, 169 A. 142 (1933). If it is possible to do so, a will must be construed to avoid an intestacy. *In re Grier's Estate, supra; Rapson's Estate,* 318 Pa. 587, 179 A. 436 (1935). In compliance with this policy favoring testamentary distribution of a decedent's assets, where a later will contains a clause of revocation of an earlier will, the clause of revocation fails if the testator is induced to make the later will by the exertion of undue influence. *In re Ash's Estate, supra,* 41 A.2d at 621; *Rudy v. Ulrich,* 69 Pa. 177, 8 AM.St.Rep. 238 (1871); Bregy, *Intestate, Wills and Estates Act of 1947,* P. 2374; 2 Bowe–Parker: *Page on Wills* § 21:59. The very incapacity which destroyed the necessary intent to make the will also destroyed the intent to revoke the old one. *Cf. Kapp's*

*Estate,* 317 Pa. 253, 176 A. 501 (1935); Aker, *Law of Wills in Pennsylvania,* Section 4:3, Bregy, *supra,* at P. 2369. Thus, the earlier will is reinstated when the unduly influenced will is declared invalid. *In re Ash's Estate, supra,* 41 A.2d at 621; *Rudy v. Ulrich, supra,* 69 Pa. at 183–84, 2 Bowe–Parker, *supra,* § 21:59.

In the instant case, the executed 1982 will is nowhere to be found. At trial, Kabboul introduced an unexecuted copy of the 1982 will which named her the residuary beneficiary as evidence of a similar testamentary scheme to rebut the presumption of undue influence. However, this copy of the 1982 will was missing page four which should have contained dispositive clauses twenty-two through twenty-eight, thus limiting its evidentiary value. Kabboul now asserts that the trial court should have directed that this unexecuted copy of the 1982 will be admitted to probate as a lost will.

The Probate, Estates and Fiduciaries Code provides that every will must be in writing and signed by the testator at the end of the will. *In re Estate of Keiser,* 385 Pa.Super. 24, 560 A.2d 148 (1989); 20 P.C.S.A. § 2502. Thus, an instrument which is not signed, as required by statute, cannot be given effect as a will. *Id.* However, judicial precedent has established an exception for a "lost will." *In re Murray's Estate,* 404 Pa. 120, 171 A.2d 171 (1961); *In re Estate of Mammana,* 388 Pa.Super. 12, 564 A.2d 978 (1989). In order to establish the existence of a lost will which was in the custody of the testator prior to his death, the proponent of the will must overcome the presumption that the testator destroyed or revoked the will. *In re Estate of Keiser, supra,* 385 Pa.Superior Ct. at 28, 560 A.2d at 151. To achieve this, the proponent of the copy of the will must prove that: 1) the testator duly and properly executed the original will; 2) the contents of the will were substantially as appears on the copy of the will presented for probate; and 3) when the testator died, the will remained undestroyed or revoked by him. *Michell v.*

*Low,* 213 Pa. 526, 63 A. 246 (1906); *In re Estate of Mammana, supra; In re of Keiser, supra.*

▮▮▮ Kabboul has met the first step of proving that the original 1982 will was duly and properly executed through the testimony of the attorney-scrivener H. Robert Mattis and one of the attesting witnesses, Debbie Smith. The third step of the test, proving that the originally executed will was not destroyed by the testator for the purpose of its revocation, has been established by the subsequent invalidation of the 1985 will.[2] *See In re Ash's Estate, supra; Rudy v. Ulrich, supra.* Therefore, Kabboul must establish the second step, that the contents of the 1982 will were substantially the same as the purported copy of the 1982 will that Kabboul seeks to have admitted to probate.

As previously stated in our discussion of Kabboul's first issue on appeal, the copy of the 1982 will which Kabboul seeks to have admitted to probate is flawed. It appears that as originally executed the 1982 will consisted of six pages containing thirty-four clauses. The copy of the 1982 will that Kabboul seeks to have admitted to probate, naming her as residuary beneficiary and making no provision for the appellees, consists only of five pages and twenty-seven clauses. The pages in Kabboul's copy of the 1982 will are numbered, one through six, and the clauses are numbered, one through thirty-four; however, page four, which should contain clauses twenty-two through twenty-eight, is missing. Thus, we must determine whether the loss of page four renders the entire copy of the 1982 inadmissible to probate. In our review we are mindful that Pennsylvania law favors disposition of a decedent's assets by testamentary direction over intestacy. *See In re Grier's Estate, supra, Provident Trust Co. of Philadelphia v. Scott, supra; Duffy's Estate, supra.*

**2.** We note that there was testimony concerning a will executed by Lafferty in 1984 which Kabboul served as scrivener and was named the residuary beneficiary. However, neither the executed will nor a copy of the will has ever been located. Accordingly, a revocation of the 1982 will cannot be established on the basis of the parol testimony concerning the unproduced 1984 will. *See Koehler's Estate* 316 Pa. 321, 175 A. 424 (1934); *Harrison's Estate,* 316 Pa. 15, 173 A. 407 (1934); *Shetter's Estate,* 303 Pa. 193, 154 A. 288 (1931); 2 Bowe–Parker: *Page on Wills* § 21:49.

A valid will may be written on separate, not physically united, sheets of paper only the last of which is signed. *In re Van Gilder's Estate*, 421 Pa. 520, 526, 220 A.2d 21, 25 (1966); 20 Pa.C.S.A. § 2502. In order to probate separate, not physically united, sheets of paper as a will, it is not necessary that such sheets be verbally united by the completion on the successive page of the sentence or paragraph which began on the preceding page. Rather, the test is whether the not physically united sheets of paper are connected by their internal sense, by coherence, or by adaption of parts. *In re Van Gilder's Estate, supra, In re Baldwin's Will*, 357 Pa. 432, 55 A.2d 263 (1947); *In re Covington's Estate*, 348 Pa. 1, 33 A.2d 235 (1943). The order of the connection must appear on the face of the will and cannot be established by extrinsic evidence. *Maginn's Estate*, 281 Pa. 514, 127 A. 79 (1924).

Instantly, the first three pages of the copy of the 1982 will submitted by Kabboul are connected both by their internal sense and by their connection to each other through the sequential numeration of the clauses which appears on the face of the copy of the 1982 will. Thus, it seems that the testamentary dispositions made on the first three pages of the copy of the 1982 will are valid. The predicament before this Court is whether is it possible to bridge the gap left in Lafferty's testamentary scheme by the loss of page four in the copy of the will, between the seemingly valid testamentary dispositions found on the first three pages of the copy of the will in clauses one through twenty-one and the provisions for the poor of Shamokin and Coal Township and the bequest of the residuary estate to Kabboul contained on page five in clauses twenty-nine and thirty.

From our careful review of the testimony of the attorney-scrivener, who was commanded by the testator not to retain a copy of the will for his files, and the attesting witness' testimony, it is impossible to discern what testamentary instructions or dispositions were contained in the missing clauses on page four. In clauses twenty-two through twenty-eight on page four, Lafferty may have disposed of the

bulk of his estate leaving very little residue for the residuary beneficiary. Or, he could have made relatively moderate bequests to the unknown parties named in the missing clauses leaving the bulk of his estate to the residuary beneficiary. The problem is that without the missing page it can never be determined exactly what the testator's intentions were as to the size of his residuary estate.

To admit the entire flawed copy of the 1982 will to probate, thus leaving the bulk of the estate to the residuary beneficiary, may be carrying out a policy which is contrary to the testator's intentions. Thus, due to the uncertainty of the size of the residuary estate, the trial court properly refused to direct the admission of the entire copy of the 1982 will with one page missing to probate as a lost will. To do otherwise would have exposed the estate to the perils of fraud. *See Maginn's Estate, supra.* However, while the trial court properly refused to direct that the entire flawed copy of 1982 will with the missing page be admitted to probate, it erred when it did not examine the document to determine if any portion could be salvaged and admitted to probate in order to prevent a total intestacy from occurring.

 A part of a lost will may be admitted to probate where it is shown that the operation of the part that can be established was not effected by the operation of the other parts. *Creek v. Laski,* 248 Mich. 425, 227 N.W. 817 (1929); *Fletcher v. Fletcher,* 186 Ind. 193, 115 N.E. 582 (1917); *In re Patterson,* 155 Cal. 626, 102 P. 941 (1909); *Tarbell v. Forbes,* 177 Mass. 238, 58 N.E. 873 (1900); *Jones v. Casler,* 139 Ind. 382, 38 N.E. 812 (1894); 3 Bowe–Parker, *Page on Wills:* § 27.6. In *Maginn's Estate, supra,* our Supreme Court stated: "Undoubtedly there may be a case where certain provisions of a will are valid and others invalid in which the former may be probated and the latter not." 281 Pa. at 518, 127 A. 79.

 Instantly, all of the bequests made by the testator in clauses one through twenty-two in the first three pages of the 1982 will are made to specifically designated persons

or organizations and the bequests are comprised either entirely of cash or cash and specifically named stocks or bond certificates. These clearly stated wishes of the testator are easily ascertainable from the provisions of 1982 will and are not dependent, unlike the residuary estate, upon what might have been distributed on the missing page. Thus, these bequests are valid and should be carried out.

■ Next, we must determine whether clause twenty-nine, located on page five of the 1982 will, which left the proceeds of the sale of specifically designated stocks and bond certificates together with 25,000 dollars to the sixty poorest families in Shamokin and Coal Township, is to be given effect. The clause authorizes the executrix to accept applications from families in the Shamokin and Coal Township area who feel they are eligible to receive a share of this bequest. The clause also orders that the amount received by each family shall be determined by the size, expenses and income of each family with the decision of the executrix being final.

■ A testamentary disposition for the benefit of the poor of a defined locality is clearly a charitable use, and will be sustained even though it could fall under the condemnation of some rule of law if it were a private or merely benevolent disposition. *Trim's Estate*, 168 Pa. 395, 396, 31 A. 1071, 1071 (1895) (a will clause devising specific land and bequesting all the residue of an estate to the poor of Eldred Township was held valid); *County of Lawrence et al. v. Leonard*, 83 Pa. 206 (1876) (a bequest to the poor of North Beaver Township was held valid); *Shepp Estate*, 29 Pa.D. & C.2d 385 (1962) (a charitable trust to aid the poor and needy of the Borough of Tamaqua was held valid); *see also* 5 Bowe–Parker, *Page on Wills* 41:11.[3] It is immaterial how vague, indefinite and uncertain the objects of the testator's bounty may be, provided there is a discretionary power vested in someone over its application to those objects.

---

**3.** 'To the poor of Stratford' was sufficient to carry the charitable gift of William Shakespeare to his townfolk. *See Trim's Estate, supra,* 168 Pa. at 396, 31 A. 1071.

*Thompson's Estate*, 282 Pa. 30, 36–37, 127 A. 446, 449 (1925); *Trim's Estate, supra; Missionary Society's Appeal*, 30 Pa. 425, 434 (1858). In such cases, the testator gives the discretionary power to those named, not as individuals, but as executors, for as long as those designated are capable of acting in that capacity. *Thompson's Estate, supra*, 282 Pa. at 38–39, 127 A. 446. If those chosen are unable for any reason to carry out the testator's wishes the court has jurisdiction to appoint a qualified person to effectuate the wishes of the testator. *Id.*

Our review of the record reveals that although Verne Lafferty was a very private man, he deeply loved the city of Shamokin and the surrounding environs of Coal Township. In order to express his feeling towards the area and its people about whom he cared so deeply, he decided to provide for its poorest people in his will. As Lafferty, in clause twenty-nine, limited his bequest to the poor of Shamokin and Coal Township, the bequest is not overly broad, and because Lafferty specially designated the assets to be used by the executrix to carry out his bequest it is not dependent on what may have been contained on the missing page. The clause, therefore, is valid and it is our duty to sustain it. *See Trim's Estate, supra.*

Our review of the rules for lost wills reveals that only a partial intestacy has occurred and that the trial court erred in failing to attempt to ascertain which portions of the 1982 will were not dependent upon the missing page and could be salvaged and given effect in order to prevent a total intestancy from occurring. The bequests on the first three pages of the will and clause twenty-nine on page five are for determinate sums which were not dependent upon the issue of the size and amount of the residuary estate; thus they are valid testamentary dispositions and must be given effect. Accordingly, we find only clauses thirty and thirty-one which concern the distribution of the residuary estate are void. Therefore, the rest of the 1982 will is valid and Lafferty's estate must be distributed according to the valid provisions of the 1982 will with the remainder of the estate

to be distributed according to the intestacy laws of Pennsylvania.

Kabboul's final issue on appeal is that the trial court erred in placing a constructive trust upon all of her real and personal assets upon its invalidation of the 1985 will. Kabboul contends that after the trial court found the 1985 will void as the product of undue influence, an evidentiary hearing should have been held before the entry of the trial court's order freezing all of her assets. Kabboul maintains this evidentiary hearing would have given her the opportunity to distinguish between Lafferty's assets which were improperly transferred to her either through the exercise of undue influence or her unauthorized use of the power of attorney and the real and personal property she earned through her own efforts. Kabboul also argues that she should be permitted to keep the purported inter vivos gifts that Lafferty allegedly ordered her to make to herself from his assets during the last years of his life. Kabboul further argues that she should be permitted to retain the difference in value between the assets that she improperly received from Lafferty and the enhanced value of those assets which accrued due to her successful management of them. Finally, Kabboul asserts that because she had several real estate projects which have been delayed due to the trial court's freeze on her assets, the appellees should be required to post a bond pursuant to Pa.R.A.P. 1731(a) to protect her financial interests while this case is pending appeal.

■■■■■ When a confidential relationship is established between the donor and the donee of a gift, the burden of proof shifts to the donee to justify the gift. *Peoples First National Bank & Trust Co. v. Ratajski*, 399 Pa. 419, 160 A.2d 451 (1960); *Estate of Gilbert*, 342 Pa.Super. 82, 492 A.2d 401 (1985). The donee, in a confidential relationship to the donor, must affirmatively show absence of deception and that the gift was an intelligent, understood act of the donor that was fair, conscientious and beyond the reach of suspicion. *Lochinger v. Hanlon*, 348 Pa. 29, 33 A.2d 1 (1943). "Transactions by which a decedent shortly before

his death practically strips himself of all his available property are naturally regarded with suspicion and are to be scrutinized with a keen and somewhat incredulous eye." *Estate of Keiper v. Moll*, 308 Pa.Super. 82, 87, 454 A.2d 31, 34 (1982) *citing Wise's Estate*, 182 Pa. 168, 171, 37 A. 936, 936 (1897); *see also Estate of Gilbert, supra.* If the donee of the gift fails to meet her burden of proof, the donee becomes a constructive trustee and should return the gift. *Peoples First National Bank & Trust Co. v. Ratajski, supra*, 399 Pa. at 424, 160 A.2d at 454. Where by the wrongful disposition of another's property the wrongdoer acquires other property, the beneficiary of the constructive trust may claim the product in whatever form it may be. *Howell v. Franke*, 393 Pa. 440, 143 A.2d 10 (1958); *Geyer v. Thomas*, 364 Pa. 242, 72 A.2d 89 (1950); Scott on Trusts: § 508.2. If the donee of the invalid gift has commingled the invalid gift with her own funds, the burden is upon the donee to prove how much of the money is her own, and if she cannot do this, the beneficiary of the constructive trust may be entitled to the whole fund. *McLauglin v. Fulton*, 104 Pa. 61 (1883); Scott on Trusts § 515 and § 516; *see also Peoples First National Bank & Trust Co. v. Ratajski, supra.*

At trial, Kabboul testified that before the commencement of her confidential relationship with Lafferty which began upon the execution of the power of attorney in her favor on January 9, 1982, she never filed a federal income tax return because she did not earn enough money. (Kabboul's testimony, Volume 5 at 20). Kabboul testified that after the commencement of the confidential relationship between Lafferty and herself, she was able to amass a quite substantial fortune in real estate through her own shrewd investments in the stock market and through inter vivos gifts given to her by Lafferty. (Kabboul's testimony, Volume 7 at 12). The inter vivos transfer of Lafferty's assets to Kabboul began in 1983, and continued in ever increasing amounts until shortly before Lafferty's death in 1986, at which time the only asset which remained in Lafferty's name was his home in Shamokin.

After reviewing the evidence, the trial court found Kabboul had failed to meet her burden of proving that the purportedly inter vivos gifts from Lafferty to her did not occur through her abuse of her confidential relationship with Lafferty. The trial court also found Kabboul's explanation of how she was able to accumulate such a real estate empire in such a short period of time to be incredible. As the trial court found Kabboul presented no credible evidence in furtherance of her position that a portion of the funds used to purchase the various properties came from the result of her own hard work and not as a result of her breach of her fiduciary duty to Lafferty, the trial court properly imposed a constructive trust upon all of her real and personal assets. While Kabboul may have undoubtedly worked hard for what she got, her labor cannot escape the taint of being part of the scheme to enrich herself. Therefore, Kabboul is in the position of the faithless trustee who may not receive compensation. *See Peoples First National Bank and Trust Co., supra, Kenin's Trust Estate,* 343 Pa. 549, 23 A.2d 837 (1942). Furthermore she is not entitled, pursuant to Pa.R.A.P. 1731(a), to have the appellees post bond to protect her ill-gotten gains pending appeal.

Accordingly, we affirm the order of the trial court invalidating the 1985 will of Verne Lafferty and placing a constructive trust upon both the real and personal assets of Mae Kabboul in order to facilitate their proper return to the estate of Verne Lafferty. However, we direct the trial court to order the admission to probate of the valid portions of the 1982 will in order to prevent a complete intestacy.

Order Affirmed in part and remanded with instructions to order the admission to probate the valid portions of the 1982 will. Jurisdiction relinquished.